UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | |
| SUHYUN AN, JOHNSON MEDICAL GROUP | ) | |
| PLLC (*d/b/a* Campbell Medical Clinic), and | ) | |
| CAMPBELL MEDICAL GROUP PLLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## COMPLAINT OF THE UNITED STATES OF AMERICA

1.     The United States of America ("United States") brings this action to recover treble damages and civil penalties arising from violations of the Federal False Claims Act, 31 U.S.C. § 3729, *et seq*. ("FCA"), and to recover damages under the common law theories of fraud, unjust enrichment, and payment by mistake.

## I.     INTRODUCTION

2.     Suhyun An is a chiropractor and nurse practitioner who manages the Campbell Medical Clinic in the Spring Valley village in Houston.  In addition to traditional chiropractic services, Campbell Medical Clinic advertises that it offers "regenerative medicine" and a host of cosmetic treatments such as Botox, Vampire Facelifts, and assorted other services.

3.     In late 2015, An learned of an enticing money-making opportunity.  The proposal: buy cheap devices for a few hundred dollars each (an inflated price justified only by the devices' reimbursement potential), tape them to patients' ears, submit a $10,000 claim to Medicare for each service, and receive well over $6,000 in reimbursement for every claim.

4.      There was a catch, though.  In order to garner the sky-high reimbursement rates, An had to bill Medicare and other insurance programs using code L8679, a very expensive code reserved for "implantable" neurostimulators where surgery had been performed.

5.      Here, however, the devices were not "implantable" and did not require surgery. Rather, the devices were simply *taped* to a patient's ear using an adhesive.  The only things that went into a patient's body were the electrodes that were inserted into the patient's ear—barely penetrating the skin—and affixed using another adhesive.  Those electrodes were powered by small batteries (*e.g.*, a 9-volt Duracell) and would generate intermittent stimulation by electrical pulses.

6.      As an illustration, below is a photo of the ANSiStim, one of the various devices used by An.[1]



7.      Although An bought similar devices from competing manufacturers, all of them were functionally identical and were commonly referred to as "p-stim" (percutaneous stimulation) devices.  ("P-STIM" was also the brand name of one of the devices.)

---

[1]      Press Release, *New DyAnsys Inc. Solution Relieves Long-Term Chronic Pain Without Narcotics*, PRNEWSWIRE.COM (available at https://www.prnewswire.com/news-releases/new-dyansys-inc-solution-relieves-long-term-chronic-pain-without-narcotics-300085673.html) (last accessed May 5, 2020).

8.      In truth, these devices were simply providing electric acupuncture.  Various brands of the p-stim devices were cleared by the Food and Drug Administration ("FDA") as electro-acupuncture stimulator devices for use by licensed acupuncturists.  Because acupuncture was not covered by Medicare, the devices were not reimbursable at all.

9.      Nevertheless, An took full advantage of the opportunity to earn fraudulent reimbursement.  Acting through Johnson Medical Group PLLC, an entity she set up to fraudulently bill Medicare with the help of a physician in Houston, An submitted at least 666 claims to the Medicare program using L8679 and received at least $3,886,119.06 in reimbursement.  She also submitted 31 claims and received at least $50,105.47 from TRICARE, an entitlement program for uniformed service members, retirees, and their families around the world.

10.      An's conduct violated the FCA, which is designed to penalize parties who defraud the federal government.  The FCA provides that the government may recover treble damages and substantial monetary penalties whenever someone submits false claims to the federal government with, among other things, "reckless disregard" for the truth or falsity of those claims.

11.      Consistent with ordinary common sense, An's emails show that she actually knew (or, at minimum, recklessly disregarded) that Medicare did not treat p-stim devices as implantable neurostimulators worthy of reimbursement of approximately $6,500 to $8,000 per claim.  In fact, she expressed concerns right when she heard of the scheme, writing in emails that she was "reading conflicting information on [the] legality of billing [p-stim] to different payor[s], including Medicare."

12.      The sales representatives marketing to An—who stood to gain from this scheme— put her in touch with consultants who told her how she could bill to garner the highest possible reimbursement.  An determined to bill Medicare using L8679 after learning that, so far, many other

doctors had gotten away with it.  In an email to her billing company, An noted that she would submit what she called "a test run" of a claim to Medicare to see if it would be paid.

13.     An knew this billing scheme was highly suspect.  Indeed, right after the "test" claim was paid, she wrote in an email that, while she could make a lot of money billing p-stim devices, she wanted to utilize a goldilocks approach—billing enough to make significant money but not overdoing it so that she could "fly under the audit radar."

14.     In fact, on multiple occasions, An was warned by her staff, her billing company, and even her then-husband who worked at the clinic that p-stim devices were not billable as implantable neurostimulators and that she was likely committing fraud.  She was even pointed directly to the guidance of a Medicare contractor stating that these devices were not payable.  Nevertheless, she continued billing—sometimes for as many as 11 devices per patient.

15.     An took other steps to evade scrutiny.  She and her clinic staff did not attempt to collect from patients the co-pay charge of approximately $1,600 that Medicare assigned to L8679 claims.  She did this to avoid raising alarms with patients, who would have been livid upon learning how much they were charged.  (Nevertheless, some patients did in fact raise concerns.)

16.     An's fraud scheme allowed her to live a lavish lifestyle.  She used the proceeds of this fraud to buy multiple luxury cars, real estate properties, and a million-dollar house in a high-end Houston neighborhood.

17.     Ultimately, An and the Campbell Medical Clinic did not stay off the government's "audit radar" and the government commenced an investigation into her practices.  The government now seeks to recover all of the money paid to Defendants, plus treble damages and statutory penalties as provided for under the FCA.

## II.    JURISDICTION AND VENUE

18.    This action arises under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 to 3733, and the common law.  This Court has subject matter jurisdiction over the entire action, including claims asserted under the common law, under 28 U.S.C. § 1345 because the United States is the Plaintiff.  In addition, the Court has subject matter jurisdiction over the FCA causes of action under 28 U.S.C. § 1331.

19.    The Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) because the Defendants reside and/or transact business in the Southern District of Texas.

20.    Venue is proper in the Southern District of Texas under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) and (c) because Defendants reside and conduct business in this district and most of the events giving rise to these claims occurred in this district.

## III.    PARTIES

21.    Plaintiff United States brings this action on behalf of (a) the United States Department of Health and Human Services ("HHS"), including HHS's component agency, the Centers for Medicare and Medicaid Services ("CMS"), which administers the Medicare and Medicaid programs; and (b) the Department of Defense, including its component, the Defense Health Agency ("DHA"), which administers the TRICARE Program.

22.    Defendant Suhyun An ("An") is a chiropractor and nurse practitioner who practices in Houston, Texas.  At all times relevant to this complaint, she has been an owner of Campbell Medical Group PLLC and has managed Johnson Medical Group PLLC.

23.    Defendant Johnson Medical Group PLLC (*d/b/a* Campbell Medical Clinic) ("Johnson Medical") is an entity that was used as a vehicle by An to bill Medicare, including for the p-stim claims at issue in this Complaint.  An submitted forms to Medicare representing that

Dr. Cheryl Johnson, a physician from West Houston, was the sole owner of Johnson Medical. However, although Dr. Johnson signed documents indicating that she was nominally the legal owner, An managed the entity and controlled the Medicare revenues it received. Dr. Johnson was instead paid a monthly fee for serving as a medical director.

24.     Defendant Campbell Medical Group PLLC ("Campbell Medical") is An's primary chiropractic practice. It is located at 1012 Campbell Road, Houston, TX 77055. An took the funds that were paid to Johnson Medical and diverted them to Campbell. An then took large distributions from Campbell to fund her lifestyle.

## IV.     LEGAL AND REGULATORY BACKGROUND

### A.   The False Claims Act

25.     The FCA prohibits knowingly presenting, or causing to be presented, to the United States government a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(1) (1986), and 31 U.S.C. § 3729(a)(1)(A) (2009).[2]  In addition, the FCA prohibits knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim. 31 U.S.C. § 3729(a)(1)(B). The FCA further prohibits knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money back to the Federal Government. 31 U.S.C. § 3729(a)(1)(G).

26.     The term "knowingly" under the FCA means that a person, with respect to information, (i) has actual knowledge of the information, (ii) acts in deliberate ignorance of the truth or falsity of the information, or (iii) acts in reckless disregard of the truth or falsity of the

---

[2]     Congress amended the FCA as a part of the Fraud Enforcement Recovery Act of 2009 on May 20, 2009, making certain amendments retroactive, including 31 U.S.C. § 3729(a)(1)(B). Congress amended the FCA again as part of the Patient Protection and Affordable Care Act on March 23, 2010.

information. 31 U.S.C. § 3729(b).  No proof of specific intent to defraud is required to show that a person acted knowingly under the FCA.  *Id.*

27.    The FCA provides that any person who knowingly presents or causes to be presented, a false or fraudulent claim for payment or approval is liable for a civil penalty of up to $22,363 per each such claim,[3] plus three times the amount of the damages sustained by the United States.

**B.  Part B of the Medicare Program**

28.    In 1965, Congress enacted the Health Insurance for the Aged and Disabled Act, which created Medicare.  42 U.S.C. § 1395, *et seq*.  Medicare is a federal health care program providing benefits to persons who are over the age of 65 and some under that age who are blind or disabled.

29.    The regulations implementing Medicare are found at 42 C.F.R. § 405, *et seq*.  Part B of Title XVIII of that Act (42 U.S.C. §§ 1395j-1395w), commonly referred to as the "Medicare Part B Program" (Part B), is administered by the United States through HHS and its component agency, CMS.  Part B is a federally-funded national health insurance program providing medical insurance protection for covered services to any person 65 years of age or older or to certain disabled patients.  Benefits are paid on the basis of reasonable and necessary charges for covered services furnished by physicians and other suppliers of medical services.

30.    CMS contracts out the adjudication of claims and the distribution of benefits under Part B to private carriers under 42 U.S.C. § 1395u.  In Texas, Novitas Solutions Inc. is the carrier that adjudicated and paid Part B claims submitted by the Defendants.

---

[3]    *See* 85 Fed. Reg. 37004, 37006. (June 19, 2020 inflation adjustment for FCA penalties applicable to post-2015 conduct).

31.     In order to submit claims to Medicare, and to be paid from the Medicare trust fund, providers must file a provider agreement with the Secretary of HHS.  42 U.S.C. § 1395cc. The agreement, the Medicare Federal Health Care Provider/Supplier Enrollment Application, CMS Form 855B, contains a certification statement in which the provider agrees, *inter alia*, that he or she (a) will abide by Medicare laws, regulations and program instructions, (b) understands that payment of a claim is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions, and (c) will comply with all applicable conditions of participation in the Medicare program. The provider also agrees not to knowingly present or cause to be presented a false or fraudulent claim for payment to Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

32.     In October 2015, Johnson Medical submitted a signed CMS Form 855B containing these representations.  This form was signed by Dr. Cheryl Johnson ("Dr. Johnson"), a physician who served as the medical director for Campbell.

33.     This form, and others, falsely indicated that Dr. Johnson was the sole owner of Johnson Medical.  This misrepresentation was aimed to ensure that Johnson Medical could bill Medicare for a greater range of services than those that could be billed just by practicing chiropractors.

34.     In reality, though, An managed the entity and controlled the profits it earned.

35.     While An did not sign the CMS Form 855, she caused its submission.  The form was shipped via FedEx on October 28, 2015 with an envelope showing that it was being sent from "Suhyun An" with a return address of "1012 Campbell Rd, Houston, TX 77055."

36.     In addition, Johnson Medical submitted claims for reimbursement to Medicare electronically by computer via phone lines.   Johnson Medical was required to identify the

beneficiary, specify the date the services were performed, describe the services performed, and specify the charge for the services performed.  An, along with her staff and outside billing company, participated in and directed this process and caused the submission of these claims.

### C.  Medicare's Medical Necessity Requirements and Coding Processes

37.     Medicare reimburses only those services that are "reasonable and necessary."  42 U.S.C. § 1395y(a)(1)(A).  Part B providers also must certify that services are medically necessary. 42 C.F.R. § 424.24(g)(1). In submitting claims to Medicare, providers must certify that the information on the claim form presents an accurate description of the services rendered and that the services were reasonably and medically necessary for the patient.  Providers must also ensure that the services they furnish meet professionally recognized standards of care.  42 U.S.C. § 1320c-5(a)(2).

38.     To identify the services performed during an office visit, Medicare requires the provider to use standardized numerical procedure codes known as CPT ("Current Procedure Terminology") and Healthcare Common Procedure Coding System ("HCPCS") codes.

39.     Providing accurate CPT and HCPCS codes on claims submission forms is material to and a condition of payment for federal health care programs such as Medicare.  *See, e.g.*, Medicare Learning Network Fact Sheet, Medicare Billing: 837P and Form CMS-1500.

40.     These codes are used by Medicare and its contractors to determine whether a service qualifies for Medicare coverage at all, and, if so, how much should be paid to the provider. CMS and its contractors routinely deny payment to providers who bill for codes when the criteria for those codes is not actually met, including when the services are not medically necessary.  In addition, CMS assigns different reimbursement amounts to CPT and HCPCS codes to reflect the services provided.

41.     CMS and its contractors have issued directives concerning what is, or is not, medically reasonable and necessary and therefore billable.

42.     At the highest level, CMS promulgates National Coverage Determinations ("NCD"), which are determinations of national application by CMS "granting, limiting or excluding Medicare coverage for a specific medical [item] or service."  68 Fed. Reg. 55634 at 55635; *see also* 42 C.F.R. § 405.1060 (stating that the promulgation of an NCD "is a determination by the Secretary of whether a particular item or service is covered nationally under Medicare").

43.     Medicare contractors such as Novitas, each of which have jurisdiction over particular regions, also issue guidance documents, called "Local Coverage Determinations" ("LCDs") or "Local Coverage Articles ("LCAs"), to address whether it is medically proper to bill under certain codes.

### D.  **The TRICARE Program**

44.     TRICARE (formerly CHAMPUS) is a federally funded entitlement program for uniformed service members, retirees, and their families around the world.  10 U.S.C. §§ 1071 to 1110.  TRICARE provides health care benefits to eligible beneficiaries.

45.     The regulatory authority implementing the TRICARE program provides reimbursement to health care providers applying the same reimbursement scheme and coding parameters that the Medicare program applies.  For example, TRICARE, like Medicare, pays only for "medically or psychologically necessary services and supplies required in the diagnosis and treatment of illness and injury."  32 C.F.R. § 199.4(a)(1)(i).

46.     Under the TRICARE for Life program, there are beneficiaries who are enrolled in Medicare and are still eligible for TRICARE ("dual eligible beneficiaries"). For these dual eligible

beneficiaries, TRICARE is the secondary payor to Medicare.  10 U.S.C. § 1086(d); 32 C.F.R. § 199.17(a)(6)(ii)(c).

47.     TRICARE considers "[b]illings or CHAMPUS claims which involve flagrant and persistent overutilization of services without proper regard for results, the patient's ailments, condition, medical needs, or the physician's orders" to be fraud. 32 C.F.R. § 199.9(c)(3). TRICARE also deems fraudulent any "misrepresentations of dates, frequency, duration, or description of services rendered[.]" 32 C.F.R. § 199.9(c)(6).  Such practices are deemed abusive and cause financial loss to the United States.

48.     In June 2012, Johnson Medical Group also submitted a provider certification form to Wisconsin Physician Services, the contractor responsible for administering TRICARE for Life. This form, which was signed by Dr. Cheryl Johnson, included a representation that "[i]t is understood[] and agreed that claims will be submitted for services which are medically indicated for the proper care of the patient, and the services  (where provided by other than a physician or a dentist) were ordered by the attending physician or dentist and that the services were actually furnished."  It also included a representation that "I also understand that the making or conspiring to make a false, fictitious, or fraudulent claim against the United States or one of its Fiscal Administrators renders such person liable to prosecution under applicable federal law."

## V.     FACTUAL ALLEGATIONS

### A.     An and Campbell Medical Clinic Falsely Submitted Claims for Electroacupuncture Using an Expensive HCPCS Code for "Implantable" Neurostimulators

49.     An submitted and caused the submission of false claims to Medicare and TRICARE by billing for the use of "p-stim" devices and obtaining millions of dollars in improper reimbursements.  This billing was false for two reasons.

50.    *First*, An billed using a code designated specifically for "implantable" devices when nothing was implanted into patients and no surgery was performed.  *Second*, the p-stim devices were not billable at all, as they were just acupuncture—which was not covered by Medicare at the time because it was not medically reasonable or necessary.

      i.    *HCPCS code L8679 is restricted to the use of "implantable" devices, and does not cover p-stim devices*

51.    HCPCS code L8679 is defined as the application of an "implantable neurostimulator, pulse generator, any type." It is a bundled code, meaning that the code is intended to reimburse the provider for both the surgery to implant the device and the device itself.

52.    HCPCS code L8679 is typically billed by providers at around $8,000 to $10,000. After making adjustments, CMS typically reimburses providers with approximately $6,300 to $6,500 per submission.  If a patient has supplemental TRICARE for Life coverage (often by virtue of their past military service), TRICARE would pay approximately $1,600 more to cover the patient's co-pay.

53.    These extremely high reimbursement rates reflect the fact that a true "implantable" device is often expensive, and the implantation of such a device involves surgery.

54.    For decades, CMS has unequivocally defined what constitutes an implantable nerve stimulator.  In fact, the NCD for Electrical Nerve Stimulators (160.7), which went into effect on August 7, 1995, stated in no uncertain terms that surgery was required:

> Payment may be made under the prosthetic device benefit for implanted peripheral nerve stimulators. Use of this stimulator involves implantation of electrodes around a selected peripheral nerve. The stimulating electrode is connected by an insulated lead to a receiver unit which is implanted under the skin at a depth not greater than 1/2 inch.

> Stimulation is induced by a generator connected to an antenna unit which is attached to the skin surface over the receiver unit. ***Implantation of electrodes requires surgery and usually necessitates an operating room***.

NCD 160.7 (NCD for Electrical Nerve Stimulators) (emphasis added).

55.     A subsequent NCD, issued in 2006, provided further guidance with respect to transcutaneous electrical nerve stimulation ("TENS") and percutaneous electrical nerve stimulation ("PENS").  NCD 160.7.1 (NCD for Assessing Patient's Suitability for Electrical Nerve Stimulation Therapy).  For TENS, the device is attached "to the surface of the skin over the peripheral nerve to be stimulated" and "is used by the patient on a trial basis."  *Id.*  For PENS, the diagnostic procedure involves a "needle electrode inserted through the skin" and is "covered only when performed by a physician or incident to physician's service." *Id.*  Both TENS and PENS are intended to be used on a trial basis, typically for one month, to determine whether an actual implanted nerve stimulator would provide therapeutic benefit.  *Id.*  TENS and PENS are also billed to Medicare using different codes that pay lower reimbursement rates than L8679.

56.     That same NCD makes it clear that in-office treatments would ***not*** be reimbursable as PENS or TENS, much less for codes relating to "implantable" devices: "Electrical nerve stimulation treatments furnished ***by a physician in his/her office***, by a physical therapist ***or outpatient clinic*** are excluded from coverage by § 1862 of [the Medicare Act]."  NCD § 160.7.1 (emphasis added).

57.     In stark contrast, the p-stim devices used by An and Campbell Medical Clinic came nowhere close to even resembling genuine "implantable" neurostimulators.

58.     For example, documents indicate that An ordered and used devices such as the P-Stim, NSS, AnsiStim, Stivax, and Primary Relief.

59.     All of these devices are functionally identical and work the same way by applying electric shock to patients' ears in a process known as electro-acupuncture.

60.     The devices resemble a hearing aid and do not require "implantation."  Instead, a provider affixes three small electrodes into a patient's ear and tapes the device to the skin.  This

process of attaching the p-stim device to a patient's ear took only a few minutes, and no anesthesia or surgery of any kind was required.  The devices were typically worn by patients for a few days, or a few weeks, and then thrown away.  Patients could not shower with the devices on their ears, lest they get wet and fall off.

61.     The devices were typically applied by nurse practitioners who worked at Campbell Medical Clinic.  Nurse practitioners cannot independently perform surgery.

62.     Indeed, it was so clear that no surgery was being performed that some patients were appalled when they received explanation of benefits (EOB) forms containing thousands of dollars in charges to the Medicare program.  Some of those patients even contacted Medicare to report that they believed that An and Campbell Medical Clinic were committing fraud.  (As outlined below, *see infra* ¶ 83, An worked to limit these complaints by not attempting to collect from patients the substantial co-pay associated with the procedure.).

63.     The medical records similarly indicate that surgery was not performed.  There was no record that patients underwent general anesthesia or any actual operation.  Rather, the application of the p-stim devices to patients' ears was misleadingly described as a "procedure" and hyper-technical language was used to make it seem more complicated than in reality.

64.     This exaggeration in the medical records was intentional.  An sought the assistance of consultants to assist in preparing "SOAP notes" (an acronym for medical records) that could be copied and pasted over and over into patient records, and emails with these consultants indicate that she attempted to "bolster" these notes so that claims would be paid.

65.     Along those same lines, she emailed her fellow chiropractor (and then-husband) Daniel Ybarra in January 2016 to ask that these SOAP notes be modified to obscure the treatment that was being provided.  In this email, she indicates that the use of the term "p-stim" in medical

records could be problematic. Instead, she attempts to use the more technical (and scientific-sounding) term "percutaneous electrical stimulator."

> **From:** **Suhyun An** dran@campbellmedicalclinic.com
> **Subject:** Fwd: PSTIM.
> **Date:** January 19, 2016 at 11:23 AM America/Los_Angeles
> **To:** Daniel Ybarra drdaniel@campbellmedicalclinic.com
>
> Is it possible to change the name to PES? [Percutaneous electrical stimulator].
>
>
> Suhyun An, DC, BSN, RN
> www.campbellmedicalclinic.com
> 1012 Campbell Rd Houston, Tx 77055
> Tel: 713-468-3155
>
>
> Begin forwarded message:
>
> **From:** Daniel Ybarra <drdaniel@campbellmedicalclinic.com>
> **Subject:** Re: PSTIM.
> **Date:** January 19, 2016 at 1:21:30 PM CST
> **To:** Suhyun An <dran@campbellmedicalclinic.com>
>
> the subjective page of CT Provider. "P-stim soapnote"

   ii.   _The P-stim devices are not covered by Medicare at all, as they simply provide acupuncture_

66.     As outlined above, the devices used by Defendants were not "implantable" and therefore did not qualify for reimbursement under HCPCS code L8679. However, their billing was improper for a separate and independent reason. Specifically, the p-stim devices were not reimbursable from Medicare at all, as they were used only for acupuncture and were not medically reasonable or necessary.

67.     Up until 2020, Medicare did not cover acupuncture treatments because acupuncture is not a medically necessary treatment. This was a longstanding determination that, like the determination of what counts as an "implantable" device, had been in place for decades. Only recently, in January 2020, did CMS allow limited coverage for acupuncture. That limited coverage was not in place at the time Defendants billed for p-stim. In addition, it applies only where a

patient has lower back pain, and it in no way authorizes the use of *separate* and inapplicable codes like L8679.

68.     At the time Defendants submitted the claims at issue in this case (2016 to 2018), the then-applicable NCD for acupuncture (30.3) stated that acupuncture was "of unknown use and efficacy" and therefore not deemed to be medically reasonable and necessary.

> Although acupuncture has been used for thousands of years in China and for decades in parts of Europe, it is a new agent of unknown use and efficacy in the United States. Even in those areas of the world where it has been widely used, its mechanism is not known.
>
> [. . .]
>
>  Until the pending scientific assessment of the technique has been completed and its efficacy has been established, Medicare reimbursement for acupuncture, as an anesthetic or as an analgesic or for other therapeutic purposes, may not be made. ***Accordingly, acupuncture is not considered reasonable and necessary within the meaning of § 1862(a)(1) of the Act***.

NCD 30.3 (Acupuncture) (emphasis added).

69.     This guidance was easy to find.  For example, below is a screenshot of a page on Medicare's website from at least 2018 to January 2020.[4]



---

[4]     https://web.archive.org/web/20200106212721/https://www.medicare.gov/coverage/acupuncture (Wayback machine capture showing a screenshot from January 6, 2020).

70.     In case there was any doubt, the Medicare contractor responsible for overseeing Medicare billing in Texas, Novitas, issued specific guidance in August 2016 stating that p-stim devices (including those used by Defendants) would not qualify for payment of any kind.  In a local coverage article ("LCA"), Novitas stated that:

> "It has come to Novitas' attention that auricular peripheral nerve stimulation has been billed to Medicare using the CPT code 64555. CPT code 64555 is described as: Percutaneous implantation of Neurostimulator electrode array; peripheral nerve (excludes sacral nerve).
>
> [. . . ]
>
> The following devices are listed under the Food and Drug Administration (FDA) approval documents as electro-acupuncture devices used for stimulation of auricular acupuncture points *and as such are non-covered by Medicare in that Acupuncture is not a covered Medicare benefit*:
>
> - NeuroStim system/NSS
> - P-stim
> - ANSiStim
> - E-Pulse"

Local Coverage Article A55240 (Auricular Peripheral Nerve Stimulation (Electro-Acupuncture Device) (emphasis added).

71.     Although the article applied to another code, 64555, it provided clear guidance that devices like the ANSiStim should not be billed to Medicare at all and were not reimbursable because they simply provided "electro-acupuncture" and "Acupuncture [was] not a covered Medicare benefit."

72.     An cannot claim that she simply did not know this guidance existed.  Rather, as outlined below, *infra* ¶ 100, An was specifically made aware of this guidance (including the LCA) yet chose to ignore it and continue billing.

**B.** **An Knew (Or, At a Minimum, Recklessly Disregarded) Her Billing Was Improper, Yet She Sought to Earn as Much Money as Possible**

73.     As explained above, *supra* ¶ 26, the FCA applies whenever someone submits false claims to the federal government "knowingly." 31 U.S.C. § 3729(b).  However, the FCA does not require specific intent to defraud, and knowledge of a claim's falsity may be shown through (i) actual knowledge, (ii) deliberate ignorance, or (iii) reckless disregard. *Id.*

74.     An's conduct demonstrates that she knew that it was improper to bill L8679 for p-stim devices when she submitted claims to the federal government.  At minimum, though, she recklessly disregarded countless red flags so that she could receive as much money as possible.

*i.    An could not reasonably view p-stim devices as "implantable" or expect them to legitimately earn over $6,000 in reimbursement*

75.     On its face, the plain language of the L8679 code is clear.  The code applies to "implantable" neurostimulators.  No reasonable medical provider could maintain that devices such as the Stivax, PSTIM, NSS, ANSiStim, or Primary Relief were implantable.  Indeed, the simplest of inquiries would have led An to NCD 160.7, which states that an implantable device requires surgery. *See supra* ¶ 54.

76.     This conclusion is backed up by common sense.  For example, the ANSiStim device utilizes a 9-volt battery, which is *taped* to patients' ears or shoulders using adhesive.  The only thing that is inserted into the skin at all are the small electrodes.  Those electrodes were fitted in such a way that they could fall off, and it is not uncommon for the device to fall off while a wearer is in the shower or performing other similar activities.  The other p-stim devices were functionally no different.

77.     The process to insert these electrodes takes just minutes and is simple enough that it was performed by nurses or other clinic staff.  In fact, emails collected during the government's

investigation indicate that employees of the Campbell Medical Clinic learned how to use the devices by watching a video on YouTube.

78.     For example, in January 2016, a sales representative wrote to An and mentioned that "the therapy is extremely easy to complete as most in person trainings won't take longer than 10-15 minutes with the health care professional."  That email also contained a YouTube link with a "basic training video."

> On Jan 7, 2016, at 11:02 AM, Mark Kaiser <kaisermarkd@hotmail.com> wrote:
>
> Dr. An:
> In addition to the previous e-mail sent this morning please see the attached PSTIM Protocol prepared by Dr. Tim Warren.
>
> Here is a basic training video for your NP, the therapy is extremely easy to complete as most in person trainings won't take longer than 10-15 minutes with the health care professional.
>
> https://www.youtube.com/watch?v=kiDr-UOFKc8
>
> I will get the package sent out by weeks end and will get you the tracking number as well as the ETA.
>
> Thank You,
> Mark
> Cell: 317-691-7191
>
> <Protocol for P-Stim.docx>

79.     Similarly, the disparity between the cost of the devices and the reimbursements received should have put An on notice that it was improper to bill L8679.  Documents collected through the government's investigation indicate that An typically paid a few hundred dollars per device.  In stark contrast, Medicare typically reimbursed Campbell at over $6,000 per claim.  And, if a patient had TRICARE for Life, Campbell would also receive approximately $1,600 more per claim.

80.     In other words, the Defendants were being paid thousands of dollars for just a few minutes (at most) of work.

81.     This surprised and disturbed multiple patients, some of whom complained to Medicare after they received explanation of benefit (EOB) forms showing thousands of dollars in charges for what they thought was a virtually worthless service.

82.     Other patients called Campbell Medical Clinic staff directly to complain about the charges and were told that the charges were being billed because, effectively, *that's just what Medicare pays for.*

83.     An worked to limit complaints like these and make sure patients were kept in the dark.  Although Medicare imposes a co-pay of approximately $1,600 for every claim submitted using L8679, Campbell Medical Clinic did not attempt to collect this co-pay from patients who did not have supplemental insurance (like that provided by TRICARE for Life).  Otherwise, patients would have balked—because, of course, they were not receiving surgery or anything worth close to that amount.

*ii.     An's primary aim was to take advantage of Medicare reimbursement*

84.     An was drawn to the opportunity to make such substantial sums of money with minimal effort.

85.     Indeed, from the very beginning, she was focused on whether the device would be profitable—not whether it actually worked.  On January 6, 2016, An sent an email to billing representative Courtney Mizner to note that she was considering billing L8679 for the p-stim device.  She noted that "***the reimbursement potential is GREAT***."

86.     On January 18, 2016, An again wrote Mizner and stated that she had "a friend here who has [M]edicare, and she's allowing me to ***bill a test run to medicare***."

20

From: **Suhyun An** dran@campbellmedicalclinic.com
Subject: PSTIM.
Date: January 18, 2016 at 2:39 PM America/Los_Angeles
To: Courtney Mizner courtney@geminibilling.com

Courtney,

I left you a vm.
can you put out a template for Pstim? I forwarded you documents sent to me by the rep.
I have a friend here who has medicare, and she's allowing me to bill a test run to medicare.
The rep said major med insurance requires pre cert, but medicare doesn't.

Let me know.


Suhyun An, DC, BSN, RN.
www.campbellmedicalclinic.com
Tel: 713-468-3155

87.     When that test claim was initially unsuccessful, An stated that she would not use the devices if they would not be paid.  In a February 4, 2016 email to a sales representative, she noted that "*[i]f this doesn't get paid, I am going to have to return the remaining units.*"  In other words, the products were not being used for their own sake and they were only going to be given to patients if An could use them to make extra money.

88.     Ultimately, the test claim was paid.  In a March 6, 2016 email to a self-interested "compliance consultant" named Timothy Warren (who is discussed below, *infra* ¶ 91), An noted, "after [ . . .] trial and error" the claim "did get processed for a bit over $8000 as you said."  In this same email, An also observed that she could "prescribe a lot of pstim a week" because she had a "fairly large [population of] [M]edicare recipients in my office."  She said that she planned to calibrate the "conservative number" of p-stim claims that she would bill in order to seek a goldilocks approach—enough to make significant amounts of money, but not too many to land her on the government's "audit radar."  An also knew her scheme was fraudulent and likely would cause Medicare to review her claims, so she proactively asked Timothy Warren "what is your fee,

to make my office audit ready?"  Essentially, An was seeking to make the Defendants' medical records false so that they would appear on their face to support the L8679 claims.



     iii.    *An was warned numerous times that it was fraudulent to bill L8679 without performing surgery*

89.    As her stated aim to stay off the government's "audit radar" makes clear, An was well aware that billing L8679 for p-stim devices was improper.  Indeed, An was warned over and over that the government would want its money back if it knew that the claims were false.

90.    From the very beginning, in December 2015, An noted that her own research indicated that p-stim could not be billed under code L8679.  In a December 24, 2015 email to a sales representative, she stated that she was "reading many conflicting articles on billing PSTIM, how it really shouldn't be billed."  She added that she "*[a]lso spoke to a few people who told me it should not be billed to Medicare*" and that she was "[h]esitant to do it."

91.    After that message, the sales representative selling the p-stim devices to An put her in touch with Warren, who would act as a "compliance" consultant.  Warren was not an attorney

who provided legal advice.  Instead, he was a fellow chiropractor who touted his services providing coding advice for a monthly fee and claimed on LinkedIn that he "work[ed] hard to teach chiropractors how to improve the amount of money they collect and get to keep."

92.     In a December 30, 2015 message, An told Warren that "I've been reading about this much and many policies specifically stat[e] pstim [is] something investigational [*i.e.*, not covered]."  She asked, "You feel confident that if I were to be audited, [I] would be able to successfully defend this code[]?"

93.     Just weeks later, An found a CMS public meeting agenda where a party had requested that a HCPCS code be created for electro-acupuncture devices like p-stim so that they could be billed.  The notes for this meeting state in no uncertain terms that there is no need to create a code for providers to use to bill for electro-acupuncture devices like the p-stim, because "[b]ased on our preliminary benefit category analysis, we believe that there would be no Medicare payment for these items."

94.     An forwarded this agenda to Warren on January 11, 2016.  She stated that "I just fo[u]nd this article, from last year[]" and asked him to "[l]ook [at] item #14."  In response, Warren noted that "[t]hey have not acted on that item yet [and] when they do I will use the code that they come up with."  He added that "[u]ntil that time I am still recommending the coding I discussed last week."

95.     Just days later, on January 14, 2016, the CEO of An's billing company, Courtney Mizner, wrote An to voice her concern with the use of L8679.  Mizner noted, "My biggest thing is your product actually 'implanted?[']  Because that is what all this calls for [sic] that I'm reading."  That day, An gave Mizner a call and followed up with another email to indicate that she would be using a friend for a "test run" of a claim to Medicare.  *See supra* ¶ 86.

96.     Yet again, on January 27, 2016, Mizner sent an email to An attaching an article and voicing her "concerns" with the use of L8679.  She noted that "even if [L8679] passed initial medical records review, [] if a detailed audit was performed they may want money back."

97.     Instead of listening to these concerns, An worked with Warren and her staff to beef up and (in her own words) "bolster" the medical records that she kept for these patients.

98.     As the dollars racked up, so did the red flags and warnings.  On June 7, 2016, another representative of An's billing company sent her an email  noting that the use of L8679 was being referred to as "**possible fraud**" and that "most carriers interpret 'implant' as being a surgical procedure **way beyond an 'insertion' of needles**."

**From:** Bethany Dick <bethany@geminibilling.com>
**Date:** June 7, 2016 at 5:03:03 PM CDT
**To:** Suhyun An <dran@campbellmedicalclinic.com>
**Cc:** Courtney Mizner <courtney@geminibilling.com>, Millie Brinson <millie@geminibilling.com>, Jackie Hill <jackie@geminibilling.com>
**Subject: Usage of 64555 and L8679**

I wanted to share an article that brought concern regarding the use of the above CPT codes.  I know Courtney shared extensive information prior to your office implementing.

This article includes several concerns that we want to bring to your attention.  One, sounds like an audit is highly likely.  If the medical documentation does not prove medical necessity, then all money will be recouped.  Secondly, they are using terminology such as "possible fraud" with the incorrect use of this code. Third, most carriers interpret "implant" as being a surgical procedure way beyond an "insertion" of needles

Please review and assess your proper usage of the code.  We are available for questions.

http://medcorpnetwork.com/2014/06/05/p-stim-coding-discussion/

99.     The concerns materialized into concrete guidance from Medicare contractors.  As discussed above, in August 2016 a Medicare contractor issued an LCA explaining to providers that electro-acupuncture devices were not covered by Medicare.  *See supra* ¶ 70.

100.    Mizner brought the LCA to An's attention on September 10, 2016.  In an email to multiple clients attaching the article, Mizner wrote that "[w]e had stated that this was a gray-area service, did not necessarily meet full code definition, and would likely be looked into by Medicare

in upcoming months."  Mizner added that the guidance made it clear that p-stim devices "should be billed under another code and will be non-covered."

101.    One week later, on September 17, 2016, An's then-husband and coworker, Daniel Ybarra, wrote her to express concern about their continued practice of billing Medicare for p-stim devices.  Ybarra noted that devices like the ANSiStim were classified as acupuncture, which was not covered by Medicare.  He noted that he felt that "we are dispensing a device not approved by Medicare [and] ***billing under an incorrect CPT code backed by false medical documentation***."

> I have attached the LCD for the TENS, and the information I found on the ANAiStim from Novitas.  On Monday I will call Novitas and get confirmation about Auricular Peripheral Nerve Stimulation.
>
> (I know you don't like problems, but if this is correct, we are dispensing a device not approved by Medicare, billing under an incorrect CPT code backed by false medical documentation.  So at worse we should not dispense this device to Medicare patients.)

102.    In response, An made it clear that she did not want to change anything about her practices or inform Medicare.  She forwarded Ybarra's message to her office manager, Samantha Orellana, and wrote that "***I hope this mo fo didn't send or do anything***" and that "***I feel like killing him right now***."



From:    **Suhyun An** dran@campbellmedicalclinic.com
Subject:  Fwd: Neurostim info
Date:    September 17, 2016 at 9:55 AM America/Los_Angeles
To:    Samantha casemanager@campbellmedicalclinic.com

I hope this mo fo didn't send or do anything. I feel like killing him right now

Dr Suhyun An
Clinic director
Johnson Medical Group PLLC DBA Campbell Medical Clinic
Tel: 713-468-3155
1012 Campbell rd #100
Houston tx 77055
www.campbellmedicalclinic.com

103.     Even Warren, who coached An on how to bill the devices, noted that they were not

billable.  On May 11, 2017, An emailed Warren to note that the FDA classified the Stivax device

as "electro acupuncture."

From: Suhyun An <dran@campbellmedicalclinic.com>
Sent: Thursday, May 11, 2017 10:45 AM
To: Timothy Warren
Subject: Stivix.

FDA says it's electro acupuncture device?

–
Suhyun An, DC, BSN, RN
Clinic Director
Campbell Medical Clinic
"Friendliest Clinic in Town!"
1012 Campbell Rd Houston, TX 77055
713-468-3155
www.campbellmedicalclinic.com

104.     In response, Warren agreed and noted that the devices were "not 100% compliant."

From:   **Timothy Warren** warrentim@msn.com
Subject: Re: Stivix.
Date:   May 11, 2017 at 3:48 PM GMT
To:     Suhyun An dran@campbellmedicalclinic.com

Yes,

Remember I told you that is what is currently classified as, they have applied for a change to a
neurostimulator.  We are waiting on their final ruling, which is why I have told all the people that it
is not 100% compliant.

Sincerely,

Tim Warren, D.C.

105.     Nevertheless, An continued to submit millions of dollars' worth of claims to

Medicare and TRICARE.

**C.  Examples of Claims Submitted by Defendants Under Code L8679**

106.     Ultimately, An and the Campbell Medical Clinic falsely submitted Code L8679 on

at least 666 claims to the Medicare program and received at least $3,886,119.06 in payment.  An

also submitted 31 claims to TRICARE and received at least $50,105.47 in payment.

107.    Some examples of the false claims that An and the Campbell Medical Clinic submitted are below:

a.  On July 12, 2016, August 1, 2016, August 24, 2016, September 7, 2016, and September 21, 2016, Patient E.S. received electro-acupuncture at the Campbell Medical Clinic.  For all five of those visits, Johnson Medical submitted a claim to Medicare under code L8679 and received $6,281.85 in payment per claim.

b.  On May 15, 2017, June 7, 2017, June 21, 2017, July 5, 2017, and August 1, 2017, Patient C.D. received electro-acupuncture at the Campbell Medical Clinic.  For all five of those visits, Johnson Medical submitted a claim to Medicare under code L8679 and received $6,325.82 in payment per claim.

c.  On December 7, 2016 and December 20, 2016, Patient A.R. received electro-acupuncture at the Campbell Medical Clinic.  For each of those two visits, Johnson Medical submitted a claim to Medicare and received $6,281.85 in payment per claim.

d.  On June 15, 2017, Patient J.O. received electro-acupuncture at the Campbell Medical Clinic.  For that visit, Johnson Medical submitted a claim to Medicare and received $6,325.82 in payment.

e.  On April 10, 2017, May 1, 2017, May 22, 2017, June 5, 2017, and June 19, 2017, Patient B.C. received electro-acupuncture at the Campbell Medical Clinic.  For each of those five visits, Johnson Medical submitted a claim to Medicare and received $6,325.82 in payment per claim.  Johnson Medical also submitted a claim for each visit to TRICARE for this service and received $1,613.73 per claim.

27

108.    All of these claims, and other claims submitted under code L8679, were materially false and should not have been submitted to Medicare or TRICARE.

109.    An, acting along with members of her staff and outside billing companies, submitted or caused to be submitted these false claims.  As outlined in detail above, An carefully selected the codes to be used and directed that those particular codes would be submitted in connection with electro-acupuncture services.  An corresponded with billing companies and even directed the use of "test" claims to Medicare.  *See supra* ¶ 86.

110.    In addition, An reaped the benefits of the reimbursement from these claims.  The money that was received by Johnson Medical Group was transferred to Campbell Medical Clinic.  Funds from Campbell Medical Clinic were used to fund An's lifestyle, which included multiple luxury vehicles (*e.g.*, BMWs and a Tesla that she purchased after she was aware of the government's investigation), a million-dollar home, and other perks.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Against An and Johnson Medical**
**False Claims Act: Causing and Presenting False Claims**
**31 U.S.C. § 3729(a)(1)(A)**

111.    The United States realleges and incorporates by reference all allegations set out in all paragraphs of this intervened complaint.

112.    During the relevant time period, Defendants An and Johnson Medical presented or caused to be presented, materially false and fraudulent claims for payment or approval to the United States.  Specifically, An and Johnson Medical submitted claims to Medicare and TRICARE under HCPCS code L8679 (implantable neurostimulator, pulse generator, any type) and received reimbursement despite the fact that the services rendered to patients (a) did not qualify for that

code because there was no implantation of any device; and (b) were not reimbursable at all, as they were just electro-acupuncture.

113.    These false claims were material to the United States' payment decisions.  Had the United States known that the services provided by An and Johnson Medical did not qualify for reimbursement, the United States would not have paid the claims.

114.    An and Johnson Medical presented or caused to be presented such claims with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

115.    Because of An's and Johnson Medical's acts, the United States sustained damages in an amount to be determined at trial, and, as a result, the United States is entitled to treble damages under the FCA, plus all civil penalties authorized by law.  An and Johnson Medical are jointly and severally liable to the United States for these damages and penalties.

**SECOND CAUSE OF ACTION**
**Against An and Johnson Medical**
**False Claims Act: Using False Records and Statements Material to False Claims**
**31 U.S.C. § 3729(a)(1)(B)**

116.    The United States realleges and incorporates by reference all allegations set out in all paragraphs of this intervened complaint.

117.    Defendants An and Johnson Medical knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims.

118.    These false records and statements include, but are not limited to, An's and Johnson Medical's agreements, representations, and certifications made in their Medicare and TRICARE provider enrollment forms and false and misleading representations on claim forms submitted to Medicare.

119.     An and Johnson Medical made or used, or caused to be made or used, such false records or statements with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

120.     These false records and statements were material to the United States' payment decisions.  Had the United States known that the services provided by An and Johnson Medical did not qualify for reimbursement, the United States would not have paid the claims.

121.     Because of An's and Johnson Medical's acts, the United States sustained damages in an amount to be determined at trial, and, as a result, the United States is entitled to treble damages under the FCA, plus all civil penalties authorized by law.  An and Johnson Medical are jointly and severally liable to the United States for these damages and penalties.

### THIRD CAUSE OF ACTION
**Against An and Johnson Medical**
**False Claims Act: Using False Records and Statements Material to an Obligation to Pay**
**31 U.S.C. § 3729(a)(1)(G)**

122.     The United States realleges and incorporates by reference all allegations set out in all paragraphs of this intervened complaint.

123.     During the relevant time period, Defendants An and Johnson Medical made and used or caused to be made or used false records or statements, including their Medicare and TRICARE enrollment agreements, material to an obligation to pay or transmit money to the United States, or knowingly concealed, avoided, or decreased on obligation to pay or transmit money to the United States.  Among other things, An and Johnson Medical knowingly retained and failed to repay reimbursements from Medicare and TRICARE for claims paid under code L8679 to which they were not entitled.

124.     An and Johnson Medical made or caused such false records or statements with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or

not they were false. An and Johnson Medical further concealed and avoided their obligation to repay money to the United States with knowledge of these obligations, or reckless disregard or deliberate ignorance of these obligations.

125.    These false records and statements were material to the United States' payment decisions.  Had the United States known that the services provided by An and Johnson Medical did not qualify for reimbursement, the United States would not have paid the claims and would have sought to recoup these funds—as it is doing now.

126.    Because of An's and Johnson Medical's acts, the United States sustained damages in an amount to be determined at trial, and, as a result, the United States is entitled to treble damages under the FCA, plus all civil penalties authorized by law.  An and Johnson Medical are jointly and severally liable to the United States for these damages and penalties.

**FOURTH CAUSE OF ACTION**
**Against An and Johnson Medical**
**Common Law Fraud**

127.    The United States realleges and incorporates by reference all allegations set out in all paragraphs of this intervened complaint.

128.    During the relevant time period, Defendants An and Johnson Medical presented or caused to be presented, materially false and fraudulent claims for payment or approval to the United States.  Specifically, An and Johnson Medical submitted claims to Medicare and TRICARE under HCPCS code L8679 (implantable neurostimulator, pulse generator, any type) and received reimbursement despite the fact that the services rendered to patients (a) did not qualify for that code because there was no implantation of any device; and (b) were not reimbursable at all, as they were just electro-acupuncture.

129.    An and Johnson Medical presented these claims with the intent to deceive and induce the United States into paying these claims.

130.    The United States relied on the materially false representations made by An and Johnson Medical and took action in reliance upon those representations, including paying money to which An and Johnson Medical were not entitled.

131.    Because of An's and Johnson Medical's acts, the United States sustained damages in an amount to be determined at trial, and, as a result, the United States is entitled to compensatory damages consisting of the total amount paid as a result of the fraudulent claims, plus interest and other compensatory or punitive damages to be determined at trial.

### FIFTH CAUSE OF ACTION
**Against An and Johnson Medical**
**Payment by Mistake of Fact**

132.    The United States realleges and incorporates by reference all allegations set out in all paragraphs of this intervened complaint.

133.    As a result of the conduct described above, the United States paid An and Johnson Medical federal funds under the Medicare and TRICARE programs to which they were not entitled. The United States paid An and Johnson Medical money for implantable neurostimulators without knowing that An and Johnson Medical did not actually implant any devices into patients or that An and Johnson Medical were performing services that were not reimbursable at all.

134.    An and Johnson Medical are liable for damages to the United States for the total amount of the payments made in error to Defendants by the United States.

## SIXTH CAUSE OF ACTION
### Against All Defendants
### Unjust Enrichment

135.    The United States realleges and incorporates by reference all allegations set out in all paragraphs of this intervened complaint.

136.    Defendants An, Johnson Medical, and Campbell Medical Clinic claimed, received, and retained the benefit of federal money from the Medicare and TRICARE programs, intended as reimbursement for legitimate implanted neurostimulators that would have been appropriately billed under code L8679, although the services offered by Defendants were not reimbursable under that code (or at all).

137.    Defendants have been unjustly enriched with money from the United States, which they should not in equity and good conscience be permitted to retain.  The United States is entitled to the return of all payments made by Medicare and TRICARE where Defendants improperly billed L8679.

## PRAYER FOR RELIEF

WHEREFORE, the United States demands and prays that judgment be entered as follows against the Defendants:

138.    On the First, Second, and Third Counts under the False Claims Act, against An and Johnson Medical for the amount of the United States' damages, trebled as required by law, and such civil penalties as are authorized by law, together with all such further relief as may be just and proper.

139.    On the Fourth Count for common law fraud, the damages sustained by the United States plus interest, costs, expenses, and other compensatory or punitive damages to be determined at trial, together with all such further relief as may be just and proper.

140.    On the Fifth Count for payment by mistake, against An and Johnson Medical Group for the damages sustained and/or amounts by which An and Johnson Medical were paid by mistake or by which An and Johnson Medical retained illegally-obtained funds, plus interest, costs, and expenses, together with all such further relief as may be just and proper.

141.    On the Sixth Count for unjust enrichment, against all three Defendants (An, Johnson Medical, and Campbell Medical Clinic) for the damages sustained and/or amounts by which the Defendants were unjustly enriched or by which the Defendants retained illegally-obtained funds, plus interest, costs, and expenses, together with all such further relief as may be just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the United States requests a trial by jury.

March 10, 2021                              Respectfully submitted,

                                            JENNIFER B. LOWERY
                                            Acting United States Attorney


                            By:     */s/ Brad R. Gray*
                                    BRAD R. GRAY
                                    Assistant United States Attorney
                                    *Attorney-in-Charge*
                                    Southern District Bar Number: 2827958
                                    Texas Bar Number: 24097759
                                    1000 Louisiana, Suite 2300
                                    Houston, Texas 77002
                                    Phone: (713) 567-9599
                                    Fax: (713) 718-3303
                                    Brad.Gray@usdoj.gov

                                    *Counsel for the United States of America*